IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| Roger Robertson, | ) |
| | ) |
| Plaintiff, | ) Case No. 14 C 50071 |
| | ) |
| vs. | ) |
| | ) |
| McDermaids Roofing and | ) |
| Insulation Company, | ) Judge Philip G. Reinhard |
| | ) |
| Defendant. | ) |

## ORDER

For the reasons stated below, defendants motion [30] for summary judgment is granted in part and denied in part. Defendant's motion is denied as to plaintiff's hostile work environment claim, including its prayer for punitive damages, and granted as to plaintiff's retaliation claim. The parties are ordered to contact Magistrate Judge Johnston within 28 days to arrange a settlement conference or mediation.

## STATEMENT-OPINION

Plaintiff, Roger Roberston, brings this action against defendant, McDermaid Roofing & Insulating Company, his former employer, claiming race discrimination and retaliation[1] in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Defendant moves [30] for summary judgment arguing that the evidence presented by plaintiff does not establish a basis for employer liability and does not support a claim for retaliation.

Plaintiff is a black male who worked as a journeyman roofer for defendant from August 27, 1996 until January 2007 when plaintiff was laid off for the winter season and did not return to work for defendant thereafter. Plaintiff was a member of the United Union of Roofers, Waterproofers, and Allied Workers, Local No. 11 ("Union") which was the exclusive representative of defendant's journeyman roofers, apprentices, working foreman, and all other employees engaged in the application and installation of roofing material. Plaintiff had no performance or disciplinary issues during his employment with defendant.

---

[1] Plaintiff's complaint alleged national origin discrimination as well but plaintiff states in his brief in opposition to summary judgment that he is dismissing any claim for national origin discrimination.

1

The Standard Working Agreement ("Agreement") to which the Union and defendant were subject provided in Article IX that "[n]either party to this Agreement shall discriminate against an employee or any Employer covered by the Agreement by reason of said person's race, color, sex, religious affiliation, national origin or any other legally prohibited basis. The provision of Article VII relating to the settlement of disputes and controversies and the arbitration thereof shall apply to any charge made by any party of a violation of this section." Article VII provides in relevant part "[a]ny grievance arising during the life of the Agreement must be brought to the attention of the Company or the Union against whom the grievance is brought within ten (10) working days after the grievance becomes known, or after it should reasonably have become known. The Company and Union shall endeavor to promptly settle the grievance. A settlement reached at this level shall be considered binding upon the parties."

Defendant did not have a separate written nondiscrimination policy. Defendant maintains it had an unwritten open-door policy to report any jobsite problems to management and that this policy was communicated to each new employee and was in effect throughout plaintiff's employment. Plaintiff denies ever being told or knowing of this unwritten policy.

The crux of plaintiff's complaint is that, while employed at defendant, he was subjected to a racially hostile work environment based on the words and actions of two of his co-workers – Bruce Wierzgacz and Mark Emerson – and that he was retaliated against by defendant for complaining about Wierzgacz and Emerson.

Plaintiff kept a record, via notations on a calendar, of the racial slurs directed at him by Wierzgacz and Emerson over the course of a period running from 2003 to 2007. Included in the record, is a summary prepared by plaintiff of these incidents which included the date and time of day of the occurrences, who was doing the harassing, what was said or done, and the jobsite (or other location) where it occurred. According to this summary, the number of times he was subjected to racial slurs over the 2003 to 2007 time period was well over 200.

In addition to the ongoing racial slurs on jobsites, there were other incidents with Emerson and Wierzgacz. In February 2004, Emerson confronted plaintiff in a bar, called plaintiff racial epithets, and attempted to provoke plaintiff into a fight. Plaintiff spoke with the police about this incident and, on the suggestion of the police that he call his employer, called Paul Naretta ("Paul"), defendant's vice president and told him what Emerson had done. According to plaintiff, Paul told plaintiff "thanks for calling" and Paul said he would "take care of things on my end." Defendant denies Paul received this phone call. Plaintiff did not file a written complaint with defendant concerning this incident. He merely called Paul. Shortly thereafter, on or about March 9, 2004[2], Emerson called plaintiff on the phone used racial slurs and again challenged plaintiff to fight. Plaintiff did not register a complaint with defendant about this call.

---

[2] The date of this phone call appears in plaintiff's affidavit submitted in opposition to summary judgment. Plaintiff recorded this call and a transcript is included in the record.

2

In June 2004, while at a jobsite, Wierzgacz threatened to fight plaintiff. Plaintiff filed a complaint with the Union's business agent about this incident and the ongoing use of racial slurs by Wierzgacz directed at plaintiff. On or about June 30, 2004, plaintiff complained in a handwritten note to Aubrey McBride, the Union's then business agent, that, on June 28, 2004, during a break at a jobsite, Wierzgacz threatened to fight plaintiff and that Wierzgacz constantly referred to plaintiff by using a racial slur rather than his name. Plaintiff testified in his deposition that he never complained directly to anyone in management at defendant about this but "went to the business agent this time," that he never presented the complaint in writing to defendant and he did not know "for sure that management ever received this complaint." McBride did not give plaintiff's written complaint to defendant. Plaintiff also testified, on examination by his counsel, that defendant was aware of his racial discrimination complaints at the time defendant, through Paul, issued a memo on July 13, 2004 ("July 13, 2004 Memo") to all employees quoting the non-discrimination provision of the Union's Standard Working Agreement (set forth above) and directing employees who are aware of discriminatory actions to report them immediately to the Union and to Paul Naretta, Bill Naretta ("Bill"), or John Greenwell ("Greenwell") at defendant.

Paul testified in his deposition that he issued the July 13, 2004 Memo because McBride had told him that McBride had received the above referenced complaint from plaintiff. Paul testified that McBride had not told him the complaint had anything to do with harassment. Paul did not recall if he knew, at the time he issued the July 13, 2004 Memo, that plaintiff's complaint was a "discriminatory complaint." Neither party's statement of facts says what, if any, action was taken by the Union in response to plaintiff's June 30, 2004 complaint about Wierzgacz. Plaintiff testified in his deposition that no one from the Union ever got back to him about this complaint. Defendant did not take any action against Wierzgacz based on this complaint to the Union.

On or about November 12, 2004, plaintiff complained to the Union about the use of racial slurs by Emerson at a Union Christmas Party that occurred on or about November 4, 2004. Defendant had no involvement in the Christmas Party. At the time, plaintiff did not report any incident involving the Christmas Party to defendant and the Union did not discuss the Christmas Party complaint with defendant.

On February 14, 2005, plaintiff made a written complaint ("February 14, 2005 Complaint") to Greenwell with copies to Paul and Bill regarding Emerson. Paul, Bill and Greenwell were the three individuals identified in the July 13, 2004 Memo as the people at defendant to whom discriminatory conduct should be reported. Plaintiff had received and read the July 13, 2004 Memo.

The February 14, 2005 Complaint covered a number incidents that had occurred to plaintiff during the time he was employed by defendant. It began with a complaint that Emerson attempted to incite plaintiff to fight on February 10, 2005 at a jobsite. When Emerson first arrived at the site on that date, he gestured to plaintiff to come over to where Emerson was and fight. Within an hour of this incident, Emerson attempted to knock plaintiff over by bumping

3

into plaintiff from behind.  The February 14, 2005 Complaint then stated "this is the 2nd and 3rd time in just the last 3 mos. Emerson has acted as a racist."  The February 14, 2005 Complaint then referenced the incident with Wierzgacz from the summer of 2004 "which resulted in" the July 13, 2004, Memo.  It went on to reference the February 2004 incident involving Emerson (discussed above) and noted the police had told plaintiff then to report to his employer that Emerson "had committed a racially motivated assault against me" and further recited that "as a result of reporting this I was removed from working w/Emerson and he was told not to call me racial slurs at work."[3]  The February 14, 2005 Complaint further stated that during the last year (after plaintiff was removed from working with Emerson and Emerson was told not to call plaintiff racial slurs at work) "sometimes when [Emerson] saw me at our shop," Emerson would start shadow boxing and staring in an intimidating manner "w/ his comrades Doug Willie, Jim Lemke and Adam Willie laughing.  He was doing this Th. AM."   It also discussed the Emerson Christmas Party incident and noted that incident was being handled by the Union business agent.  The complaint also specifically asked defendant for "no more illegal threating [sic] behaviour at our shop; at X-mas parties or the jobsites from this drunk racist please after 4 years of harassment I must ask you to help."

      Paul investigated only the February 10, 2005 incident that was reported in the February 14, 2005 Complaint.  Paul identified Ray Costello as a witness to that incident, interviewed Costello, and Costello reported to Paul that nothing had occurred.  On or about February 15, 2005, defendant informed the Union of plaintiff's February 14, 2005 Complaint through the Union's then business agent, Mitch Terhaar.  The next day, Bill Naretta, defendant's president, forwarded plaintiff's February 14, 2005 Complaint to the Union writing that defendant "in no way will tolerate such behavior by any employees" and insisting the Union inform defendant when the Union will have Emerson under control.  Bill's letter recommended the Union enroll Emerson in detox and anger management programs.  Terhaar went to the jobsite and interviewed plaintiff and co-workers.  No witnesses identified any racial comments or were able to substantiate the February 10, 2005 workplace violence allegations.  The Union's investigation of plaintiff's Christmas Party complaint found one witness who overheard Emerson's comments at the party.  The result of the Union's investigation was that the Union found Emerson violated the Union's By-laws by his racial comments made to plaintiff during the Union's Christmas Party based on the Christmas Party complaint and issued Emerson a warning for that violation but found no witnesses to the February 10, 2005 incident.  The Union's By-laws are not in the record.

---

[3] While defendant denies Paul ever received the call from plaintiff reporting the February 2004 incident, plaintiff reports in the February 14, 2005 Complaint that defendant had taken the action of keeping plaintiff from working with Emerson and telling Emerson not to call plaintiff racial slurs at work in response to that call.  Defendant admits Paul had some knowledge of a conflict between plaintiff and Emerson so that he tried to keep them separate on jobsites but denies Paul received the call from plaintiff.

4

Defendant asked the Union what the results of the Union's investigation were and was advised the Union could not substantiate the complaint concerning the February 10, 2005 jobsite incident. Thereafter, defendant tried to ensure that plaintiff and Emerson worked on separate jobsites. Defendant did not investigate anything else in plaintiff's February 14, 2005 Complaint beyond the specific February 10, 2005 incident. It did not ask plaintiff about the "4 years of harassment" he claimed he had suffered from Emerson.

In 2005, plaintiff required surgery as the result of a workplace injury. Plaintiff was off work for some time and was medically released to return to work on February 27, 2006.

On or about June 27, 2006, plaintiff left Bill a voicemail complaining about Emerson's harassment and drunkenness. Bill denies receiving this complaint. At some point after leaving this voicemail, Terhaar (the Union business agent) showed up at a jobsite where plaintiff was working and "pretty much told me that if I filed another complaint that he was going to tell his buddy Bill Naretta to lay me off." Prior to this encounter with Terhaar, plaintiff had not complained to Terhaar about this incident with Emerson. Plaintiff had only left the voicemail for Bill.

On January 10, 2007, Wierzgacz attempted to push plaintiff off a roof on a jobsite. According to the deposition testimony of Benjamin Rocha, a co-worker present during this incident, Wierzgacz made derogatory statements of a racial nature to plaintiff before Wierzgacz attempted to push plaintiff off the roof. Plaintiff did not report this incident to defendant or to the Union. This was plaintiff's final date of employment with defendant.

Plaintiff was laid-off and was never called back to work by defendant. Defendant maintains it does not call employees to come to work after a seasonal layoff but that the employees call defendant. Plaintiff contends that until the January 2007 layoff, defendant always called plaintiff to come in and work after a layoff. Plaintiff did not call defendant seeking work after the January 2007 layoff. Paul testified in his deposition that defendant had work for plaintiff and would have re-employed him if he had called. Plaintiff has not worked for defendant since January 2007.

"Title VII, in addition to prohibiting discrimination that has direct economic consequences, forbids employers from requiring people to work in a discriminatorily hostile or abusive environment. When the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." Boss v. Castro, No. 14-2996, 2016 WL 1073239, *7 (7th Cir. Mar. 18, 2016) (internal quotation marks and citations omitted.) "Surviving summary judgment on a hostile work environment claim requires sufficient evidence demonstrating (1) the work environment was both objectively and subjectively offensive; (2) the harassment was based on membership in a protected class or in retaliation for protected behavior; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability." Id.

5

Defendant's summary judgment motion does not attempt to argue that plaintiff's evidence on the first three prongs is insufficient to survive summary judgment. Defendant disputes only the fourth prong – whether there is a basis for employer liability. A "basis for employer liability" means that "either a supervisor participated in the harassment or that [the defendant] was negligent in discovering or remedying co-worker harassment." Liu v. Cook County, 14-1775, 2016 WL 1019324, *11 (7th Cir. Mar. 15, 2016). An employer can be liable for a hostile work environment "if it did not promptly and adequately respond to employee harassment. That means, it needed to respond in a manner reasonably likely to end the harassment. What is reasonably likely to end the harassment, of course depends on the particular facts and circumstances of the case." May v. Chrysler Group, LLC, 716 F.3d 963, 971 (7th Cir. 2013) (internal quotation marks and citations omitted.) "[S]uccess or failure stopping the harassment does not determine whether an employer is liable. Nevertheless, the efficacy of an employer's remedial action is material to a determination whether the action was reasonably likely to prevent the harassment from recurring." Id. (internal quotation marks and citations omitted.) Here, it is undisputed that the alleged harassers were not plaintiff's supervisors but were his co-workers – fellow journeyman roofers. The question is whether defendant was negligent in discovering or remedying the co-worker harassment.

After the February 2004 confrontation with Emerson at a bar, during which Emerson used racial slurs directed at plaintiff, plaintiff called Paul and told him what Emerson had done. According to plaintiff's later written complaint (on February 14, 2005) about a later incident, the result of plaintiff's February 2004 complaint to Paul was that plaintiff "was removed from working w/Emerson and he was told not to call me racial slurs at work."

In June 2004, plaintiff filed the written complaint about Wierzgacz with McBride, the Union business agent. Plaintiff did not also file a complaint with defendant, oral or written, about this incident. According to Paul's deposition testimony, McBride told Paul that McBride had received a complaint from plaintiff and, though Paul did not recall if he knew plaintiff's complaint was a "discriminatory complaint", Paul issued the July 13, 2004 Memo because McBride had told Paul about plaintiff's complaint. The July 13, 2004 Memo directed defendant's employees who are aware of any discriminatory actions to "please report it immediately to Roofers Local #11 and myself [Paul], Bill Naretta or John Greenwell." While Paul may not have recalled during his deposition whether he knew plaintiff's complaint was about discrimination, the inference can reasonably be drawn that he was aware plaintiff's complaint to McBride was a complaint about discrimination based on the content of the July 13, 2004 Memo Paul issued in response to McBride telling him about the complaint.

On February 14, 2005, plaintiff made the February 14, 2005 Complaint. On February 15, 2005, Paul, on behalf of defendant, wrote to Terhaar at the Union confirming that Terhaar was going to immediately contact plaintiff about his complaint and take action. The letter stated that defendant "takes this issue very seriously and will not allow such actions by any employees." Paul also investigated the February 10, 2005 incident alleged in the complaint himself. Paul identified Ray Costello as a witness to that incident, interviewed Costello, and Costello reported

that nothing had occurred. On February 16, 2005, Bill wrote a letter to Terhaar on behalf of defendant enclosing the February 14, 2005 Complaint and noting defendant "in no way will tolerate any such behavior by any employees." When defendant learned the result of the Union's investigation (that the investigation did not find a witness to back plaintiff's allegations about the February 10, 2005 jobsite incident), defendant tried to insure that plaintiff and Emerson worked on separate jobsites thereafter.

On June 27, 2006, plaintiff left a voicemail for Bill complaining about Emerson's harassment and drunkenness. Plaintiff never received a response to this voicemail from Bill or anyone else at defendant. However, a reasonable inference can be drawn that defendant contacted the Union about plaintiff's complaint because Terhaar, the Union business agent, came to a jobsite and told plaintiff that if plaintiff filed another complaint Terhaar was going to tell Bill to lay plaintiff off.

Defendant argues plaintiff failed to notify defendant of the extent of the alleged harassment. It contends that though plaintiff catalogued a myriad of actions by Emerson and Wierzgacz, including racial slurs and racially charged threats, plaintiff never reported this conduct to defendant. Defendant maintains plaintiff did not follow the defendant's policy for reporting misconduct or harassment to management. When plaintiff did report a problem with Emerson to Greenwell in writing in the February 14, 2005 Complaint, defendant argues that plaintiff only clearly alleged that Emerson was making physical threats and "only alluded to anything more nefarious by calling Emerson a drunk and a racist."

However, plaintiff's evidence shows plaintiff called Paul in February 2004 about Emerson's racial slurs and attempt to provoke plaintiff to fight; that plaintiff complained to the Union about Wierzgacz use of racial slurs and that Paul issued the July 13, 2004 Memo concerning reporting discriminatory behavior after being notified by the Union of plaintiff's complaint. The February 14, 2005 Complaint not only advised defendant of the February 10, 2005 jobsite incident with Emerson but recapped the racial nature of incidents that had been the subject of prior complaints about Emerson and Wierzgacz, set forth the shadowboxing/intimidation incidents occurring at the shop and specifically asked defendant for "no more illegal threating [sic] behaviour at our shop; at X-mas parties or the jobsites from this drunk racist please after 4 years of harassment I must ask you to help." The evidence shows plaintiff left a voicemail for Bill in June 2006 telling him Emerson was on the jobsite threatening and harassing plaintiff. While this voicemail did not specifically mention race, given the prior history and complaints about Emerson, it would be unreasonable for Bill to think race had nothing to do with Emerson's threatening and harassing behavior. For purposes of summary judgment, plaintiff has shown he, and in the case of Wierzgacz's June 2004 actions, the Union representing plaintiff, notified defendant of racially-based hostile actions directed at plaintiff by Emerson and Wierzgacz.

To summarize, plaintiff made three complaints to defendant concerning Emerson: the February 2004 phone call to Paul which defendant denies Paul received; the February 14, 2005

7

Complaint which defendant referred to the Union; and the June 2006 voicemail to Bill which defendant denies Bill received. Plaintiff made no other complaints to defendant. Additionally, plaintiff filed a written complaint with the Union in June 2004 about Wierzgacz's use of racial slurs and his threat, during a break at a jobsite, to fight plaintiff. The Union advised defendant that plaintiff had made this complaint. In light of these complaints, was defendant negligent in discovering or remedying the co-worker harassment?

In response to the February 14, 2005 Complaint, Paul found one witness who told him nothing had occurred between plaintiff and Emerson at the jobsite on February 10, 2005. Defendant then referred the matter to the Union. The Union investigation found no witnesses to the incident and took no action against Emerson related to it (though the Union found Emerson had violated the Union's By-laws when he used a racial slur at the Union's Christmas Party.) Upon learning of the result of the Union's investigation, defendant tried to keep plaintiff and Emerson at separate jobsites. Defendant did not make any inquiries regarding the other matters set out in the February 14, 2005 Complaint. It did not inquire about or investigate plaintiff's allegations that Emerson had committed a racially motivated assault against plaintiff in February 2004, nor did it investigate or inquire about the allegations that Emerson sometimes at the shop would start shadowboxing when he saw plaintiff and stare in an intimidating manner and that Emerson had been doing this as recently as "Th. AM" (which one can infer means the Thursday morning preceding February 14, 2005 which would have been February 10, 2005), nor did it ask about the "4 years of harassment" plaintiff claimed he had suffered at the hands of Emerson.

Taking the evidence most favorably to plaintiff, defendant was negligent in discovering or remedying the harassment by plaintiff's co-workers. When defendant received the February 14, 2005 Complaint it investigated only one of the allegations in that complaint – the February 10, 2005 jobsite incident. The February 14, 2005 Complaint set out a number of incidents over the years, which if true, would show a pattern of race-based hostility against plaintiff by Emerson which continued from at least February 2004 through a few days before the February 14, 2005 Complaint. Defendant did nothing to investigate any of these other incidents and took no action related to them. It did not ask plaintiff about any of them.

Defendant acted as if it was the Union's duty to investigate plaintiff's allegations and stop any workplace discrimination. However, this obligation falls on the employer not on the Union. E.E.O.C. v. Pipefitters Association Local Union 597, 334 F.3d 656, 659 (7th Cir. 2003). If a union member is engaging in racial harassment, [t]he union is not his employer and cannot fire him." Id., at 661. In fact, the union has a statutory duty to represent him fairly in any disciplinary proceeding by the employer. Id. While defendant may have referred the matter to the Union, in an attempt to avoid friction with the Union – and possibly a grievance over any disciplinary action taken against Emerson – defendant was obligated to take steps to discover and remedy the harassment. May, 716 F.3d at 973. It was "not excused from taking those steps because it [was] concerned about friction with the union." Id. The only action the Union could take against Emerson was action like it took under its own By-Laws. Only defendant could discover and remedy workplace discrimination and it did not make a meaningful attempt to do so. If

8

defendant believed referring these matters to the Union met its obligations to discover and remedy racial discrimination against defendant's employees by their co-workers, it was mistaken.

In order to survive a summary judgment motion on a retaliation claim, a "Title VII plaintiff proceeding under the direct method must show that (1) he engaged in protected activity; (2) he suffered a materially adverse employment action; and (3) there was a causal link between the protected activity and the adverse action. A causal link requires more than the mere fact that an employer's action happens after an employee's protected activity." Boss, 2016 WL 1073239 at *5 (internal quotation marks and citations omitted.) "To prove retaliation under the indirect method, a plaintiff must show that (1) he engaged in protected activity; (2) he suffered a materially adverse employment action; (3) he was meeting his employer's legitimate expectations; and (4) he was treated less favorably than similarly-situated employees who did not engage in protected activity. Once a prima facie case is established, a presumption of retaliation is triggered, and the burden shifts to the employer to articulate some legitimate, nonretaliatory reason for its action. When the employer does so, the burden shifts back to the plaintiff, who must present evidence that the stated reason is a pretext, which in turn permits an inference of unlawful retaliation." Id.

Plaintiff's retaliation claims fails under the indirect method because plaintiff does not offer evidence of any similarly-situated employee who did not engage in protected activity, who was recalled to work for defendant without contacting defendant and asking for work. Plaintiff claims defendant's failure to call him to come back to work after a winter layoff in January 2007 was in retaliation for his race discrimination complaints about Emerson and Wierzgacz. Plaintiff claims in prior years defendant called him back to work and that he did not call defendant seeking work. Defendant disputes this and says it did not as a practice call roofers to return to work after a seasonal layoff. Rather, roofers who wanted employment would call defendant. Plaintiff did not call and was not recalled.

Plaintiff has not offered any evidence that defendant initiated calls to any other roofers recalling them to work after the January 2007 seasonal layoff. In the absence of such evidence, plaintiff has not shown he was treated any differently than anyone else who had worked for defendant prior to the January 2007 layoff. Likewise, by failing to show evidence that any roofers were called by defendant – rather than the roofers calling defendant – to return to work after the January 2007 layoff, plaintiff has failed to show that plaintiff's not calling was a pretext rather than the real reason plaintiff did not go back to work for defendant.

Under the direct method, plaintiff may establish a causal link between his protected activity and the adverse employment action by either direct evidence "which would entail something akin to an admission by the employer ('I'm firing you because you had the nerve to accuse me of sex discrimination!')," Harden v. Marion County Sheriff's Department, 799 F.3d 857, 862 (7th Cir. 2015) (internal quotation marks and citations omitted) or plaintiff "may also present a 'convincing mosaic' of circumstantial evidence that would permit the same inference without the employer's admission." Id. (internal quotation marks and citations omitted). That is,

9

plaintiff "may establish retaliation by assembling a number of pieces of evidence none meaningful in itself, consistent with the proposition of statistical theory that a number of observations each of which supports a proposition weakly can, when taken as a whole, provide strong support if all point in the same direction." Id. (internal quotation marks and citations omitted). The Seventh Circuit Court of Appeals has "recognized three categories of circumstantial evidence: suspicious timing, ambiguous statements, and other bits and pieces from which an inference of retaliatory intent might be drawn; evidence that similalry-situated employees were treated differently; and evidence that the employer's stated reason for the decision was a pretext." Id.

Plaintiff has no direct evidence. While plaintiff testified in his deposition that Terhaar, the Union's business agent, came to a jobsite shortly after plaintiff left Bill the June 2006 voicemail, and "pretty much told me that if I filed another complaint that he was going to tell his buddy Bill Naretta to lay me off," this statement reflects an action Terhaar was threatening to take not an action defendant was threatening to take. Plaintiff has no direct evidence anyone at defendant ever said anything evincing an intent to retaliate against plaintiff.

Plaintiff's circumstantial evidence is also insufficient. He relies primarily on not being called by defendant to return to work after the January 2007 seasonal layoff. He maintains in the past defendant always called him to return and that he did not call defendant. Defendant says its practice was that roofers called it when they were looking to work after a seasonal layoff not for defendant to call the roofers. Plaintiff's last complaint to defendant was the June 2006 voicemail he left for Bill. The seasonal layoff occurred in January 2007 – seven months later – and necessarily, plaintiff's not returning to work after that layoff occurred even later. There is no suspicious timing. Plaintiff does not offer any "ambiguous statements" by defendant. As discussed above, plaintiff has offered no evidence that defendant initiated calls to any other roofers recalling them to work after the January 2007 seasonal layoff. This defeats any argument that similarly-situated employees were treated better or that the reason given for plaintiff not obtaining work with defendant – plaintiff's failure to call and ask for work – was a pretext for retaliation. Plaintiff has not presented circumstantial evidence from which retaliation can be inferred.

Defendant also seeks summary judgment on the issue of the availability of punitive damages under the hostile work environment claim. In its opening brief, defendant's only argument on this point is that "Plaintiff has not produced and cannot produce evidence to support punitive damages allegations beyond the conclusory allegations found in the complaint." In its reply brief, it states "the undisputed facts show that Defendant engaged in multiple efforts to address discrimination in its workplace. First, Defendant provided its nondiscrimination policy in writing. Thereafter, when Plaintiff actually informed Defendant of a complaint in February 2005, Defendant took prompt action by investigating the complaint and separating Plaintiff and the alleged offender."

The existence of a written anti-discrimination policy is relevant but "not sufficient by itself to insulate [defendant] from punitive damages liability." May, 716 F.3d at 975. The defendant must actively enforce the policy. Williams v. Phillips 66 Co., 72 F. Supp. 3d 938, 962 (S.D. Ill. 2014). Defendant contends it took prompt action in investigating the complaint "when Plaintiff actually informed" it of a complaint. However, as discussed above, defendant only investigated a portion of the February 14, 2005 Complaint – the portion relating to the February 10, 2005 incident – and that investigation consisted of talking with one witness and then referring the complaint to the Union. Defendant did not investigate the other incidents set forth in the complaint which disclosed the racial nature of the co-workers' alleged harassment of plaintiff. Defendant has not shown it is entitled to summary judgment on the issue of the availability of punitive damages.

It is important to note that surviving summary judgment is a long way from winning the case. On summary judgment, all of the evidence must be taken most favorably to the plaintiff. There is certainly evidence in the record which could be construed favorably to the defendant by a trier of fact. Both parties would be well-served by making a serious attempt to settle this case, especially in light of the age of the claims and the extended period of time spent in the administrative process prior to the case being filed in this court.

For the foregoing reasons, defendants motion [30] for summary judgment is granted in part and denied in part. Defendant's motion is denied as to plaintiff's hostile work environment claim, including its prayer for punitive damages, and granted as to plaintiff's retaliation claim. The parties are ordered to contact Magistrate Judge Johnston within 28 days to arrange a settlement conference or mediation.

Date: 4/19/2016  ENTER:

*Philip G. Reinhard*

United States District Court Judge

Copy to Magistrate Judge Johnston
Electronic Notices. (LC)